1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    PERCY LAMONTE CAMEL,                    No. 2:18-cv-1560-TLN-EFB P

12                  Petitioner,

13           v.                               FINDINGS AND RECOMMENDATIONS

14    STUART SHERMAN,

15                  Respondent.

16

17          Petitioner is a California state prisoner who, proceeding with counsel, brings an

18   application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He was convicted in the

19   San Joaquin County Superior Court of: (1) two counts of first degree murder (Pen. Code § 187);

20   (2) the multiple murder special circumstance (Pen. Code § 190.2); (3) one count of attempted

21   murder (Pen. Code §§ 664, 187); (4) multiple counts for firearm use (Pen. Code §§ 12022.5,

22   12022.53); (5) shooting at an inhabited dwelling and an occupied motor vehicle (Pen. Code

23   § 246); (6) being a prohibited person in possession of a firearm (Pen. Code § 12021); and (7)

24   possession of an assault weapon (Pen. Code § 12280).  The immediate habeas petition raises the

25   following claims: (1) petitioner's Fourth Amendment rights were violated when the trial court

26   denied his motion to suppress evidence seized from a car trunk;[1] (2) petitioner's Fourth

27   _____

28          [1] Petitioner emphasizes that, if it is determined that this claim fails for lack of standing, he

                                           1

Amendment rights were violated when the trial court denied his motion to suppress evidence obtained by wiretap; (3) the trial court committed prejudicial error when it declined to sever factually distinct counts against him into separate trials; and (4) the trial court violated his due process rights by failing to sua sponte instruct on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter.

For the reasons stated below, the petition must be denied in its entirety.

## FACTUAL BACKGROUND

Two separate incidents underlie petitioner's convictions.

### I. Skyline Incident

 On December 1, 2009, Roberto Hernandez was driving his car toward a Stockton liquor market. Two friends – Alejandro Salazar and Jorge Sanchez – rode with him. En route, they spotted petitioner driving a distinctive purple Oldsmobile up and down the streets of the neighborhood. Based on the methodical way petitioner was driving, Hernandez and his companions concluded that he was looking for them. At trial, Salazar testified that, roughly five months prior, he had encountered petitioner at a stop sign while both were driving separately. Petitioner later phoned Salazar and accused him of trying to stare him down – an expression which petitioner interpreted as a sign of disrespect. Thereafter, Salazar began attempting to avoid petitioner.

Fearing a confrontation, the three men changed plans and made for a different liquor store. Nevertheless, when they reached their new destination, petitioner was already parked outside. Upon seeing Hernandez and company, petitioner leaned out of the window of his car and shouted, "I'm going to kill you all." Hernandez promptly drove out of the parking lot, but not before Sanchez, who was armed, fired a shot from the front passenger seat.

After the encounter in the liquor store parking lot, Hernandez, Salazar, Sanchez, and other acquaintances congregated on the sidewalk of Skyline Drive - an area that was not a popular hangout spot – to smoke marijuana and avoid petitioner. Shortly thereafter, gunshots rang out.

<hr />

also raises a Sixth Amendment claim that his counsel was deficient for failing to present evidence of standing before the trial court.

More than nine shots were fired in rapid succession from behind bushes on an adjacent street corner. The gunman was an African American male, with the same complexion and build as petitioner.

Salazar was shot in his left leg and left arm, but managed to escape with his life. Hernandez was shot in his pelvic area and in his chest. He was transported to a hospital where, despite the best efforts of emergency physicians to resuscitate him, he bled to death. The chest wound was subsequently identified as the cause of death.

II. USA Gas Incident

On February 6, 2010, Francisco Bernardino, Raul Abundes Jr., Vicente Cardenas, Jorge Sanchez (the same as was involved in the foregoing Skyline incident), and others drove from Stockton to the Palladium Nightclub in Modesto. Petitioner was present at the club that night with friends, including a man named Chris Padilla. While at the club, an altercation broke out between Padilla and Cardenas. Cardenas punched Padilla and fled; the latter was kicked out of the club. Padilla told his companions – including petitioner – about what had befallen him.

In the early morning hours of February 7, 2010, and after the nightclub closed, both groups returned to Stockton. Petitioner retrieved a gun from his house and, together with his friends, drove around looking for Cardenas. Meanwhile, Cardenas had eaten a meal at a local Denny's restaurant and been dropped off at his house by Bernardino.

After dropping off Cardenas, Bernardino and Abundes stopped at a USA gas station. Abundes wanted to purchase a cigar that he could use to roll a marijuana cigarette. After Abundes went inside and made his purchase, the two men sat in the car and talked. While the two men conversed in the car, a pair of gunmen fired approximately thirty rapid shots at them. Abundes felt a bullet graze his neck, proceeded to duck down and place his head between his knees, and survived the shooting.

Bernardino died at the scene. An autopsy revealed that he was shot between fifteen and twenty-two times with high velocity rounds. Two of the bullet wounds were classified as fatal – (1) a bullet that entered his cranial cavity and exploded and (2) a bullet that entered his chest, lacerated a lung, and caused massive bleeding in his chest cavity.

Later that morning, petitioner called Padilla and stated that he had shot some of Cardenas' friends. He also indicated that he had been responsible for the Skyline shooting. Additionally, a male caller left a message on Cardenas' cell phone saying "Go pick up your boy at the gas station. I think he's dead, ha-ha-ha-ha."

## STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

I.     Applicable Statutory Provisions

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000). It does not, however, "imply abandonment or abdication of judicial review," or "by definition preclude relief." *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003). If either prong (d)(1) or (d)(2) is satisfied, the federal court may grant relief based on a de novo finding of constitutional error. *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state law procedural principles to the contrary. *Id.* at 784-785 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)).

/////

4

"The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

A.      "Clearly Established Federal Law"

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. *Lockyer v. Andrade*, 538 U.S. 63, 71 72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether . . . the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013).

B.      "Contrary To" Or "Unreasonable Application Of" Clearly Established Federal Law

Section 2254(d)(1) applies to state court adjudications based on purely legal rulings and mixed questions of law and fact. *Davis v. Woodford*, 384 F.3d 628, 637 (9th Cir. 2003). The two clauses of § 2254(d)(1) create two distinct exceptions to AEDPA's limitation on relief. *Williams*, 529 U.S. at 404-05 (the "contrary to" and "unreasonable application" clauses of (d)(1) must be given independent effect, and create two categories of cases in which habeas relief remains available).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." *Id.* at 405. This includes use of the wrong legal rule or analytical framework. "The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of the AEDPA." *Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002). *See, e.g., Williams*, 529 U.S. at 391, 393 95 (Virginia Supreme Court's ineffective assistance of counsel analysis "contrary to" *Strickland*[2] because it added a third prong unauthorized by *Strickland*); *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir.

---

[2] *Strickland v. Washington*, 466 U.S. 668 (1984).

5

2010) (California Supreme Court's *Batson*[3] analysis "contrary to" federal law because it set a higher bar for a prima facie case of discrimination than established in *Batson* itself); *Frantz*, 533 F.3d at 734 35 (Arizona court's application of harmless error rule to *Faretta*[4] violation was contrary to U.S. Supreme Court holding that such error is structural). A state court also acts contrary to clearly established federal law when it reaches a different result from a Supreme Court case despite materially indistinguishable facts. *Williams*, 529 U.S. at 406, 412 13; *Ramdass v. Angelone*, 530 U.S. 156, 165 66 (2000) (plurality op'n).

A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407 08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520 21 (2003). This does not mean, however, that the § (d)(1) exception is limited to applications of federal law that "reasonable jurists would all agree is unreasonable." *Williams*, 529 U.S. at 409 (rejecting Fourth Circuit's overly restrictive interpretation of "unreasonable application" clause). State court decisions can be objectively unreasonable when they interpret Supreme Court precedent too restrictively, when they fail to give appropriate consideration and weight to the full body of available evidence, and when they proceed on the basis of factual error. *See, e.g., Williams*, 529 U.S. at 397-98; *Wiggins*, 539 U.S. at 526 28 & 534; *Rompilla v. Beard*, 545 U.S. 374, 388 909 (2005); *Porter v. McCollum*, 558 U.S. 30, 42 (2009).

The "unreasonable application" clause permits habeas relief based on the application of a governing principle to a set of facts different from those of the case in which the principle was announced. *Lockyer*, 538 U.S. at 76. AEDPA does not require a nearly identical fact pattern before a legal rule must be applied. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Even a
/////

---

[3] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[4] *Faretta v. California*, 422 U.S. 806 (1975).

6

general standard may be applied in an unreasonable manner. *Id.* In such cases, AEDPA deference does not apply to the federal court's adjudication of the claim. *Id.* at 948.

Review under § 2254(d) is limited to the record that was before the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. *Id.* In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." *Id.* at 1399.

Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." *Frantz*, 533 F.3d at 738 (emphasis in original). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In *Richter*, *supra*, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny. *Richter*, 131 S. Ct. at 786.

C.    "Unreasonable Determination Of The Facts"

Relief is also available under AEDPA where the state court predicated its adjudication of a claim on an unreasonable factual determination. Section 2254(d)(2). The statute explicitly limits this inquiry to the evidence that was before the state court.

Even factual determinations that are generally accorded heightened deference, such as credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2). For example, in *Miller El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court ordered habeas relief where the Texas court had based its denial of a *Batson* claim on a factual finding that the prosecutor's asserted race neutral reasons for striking African American jurors were true. *Miller El*, 545 U.S. at 240.

An unreasonable determination of facts exists where, among other circumstances, the state court made its findings according to a flawed process – for example, under an incorrect legal standard, or where necessary findings were not made at all, or where the state court failed to consider and weigh relevant evidence that was properly presented to it. *See Taylor v. Maddox*, 366 F.3d 992, 999 1001 (9th Cir.), *cert. denied*, 543 U.S. 1038 (2004). Moreover, if "a state

court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in a 'unreasonable determination' of the facts" within the meaning of § 2254(d)(2). *Id.* at 1001; *accord Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section 2254(d)(2) because "state court . . . refused Nunes an evidentiary hearing" and findings consequently "were made without . . . a hearing"), *cert. denied*, 543 U.S. 1038 (2004); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("state courts could not have made a proper determination" of facts because state courts "refused Killian an evidentiary hearing on the matter"), *cert. denied*, 537 U.S. 1179 (2003).

A state court factual conclusion can also be substantively unreasonable where it is not fairly supported by the evidence presented in the state proceeding. *See, e.g., Wiggins*, 539 U.S. at 528 (state court's "clear factual error" regarding contents of social service records constitutes unreasonable determination of fact); *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) (state court's finding that the prosecutor's strike was not racially motivated was unreasonable in light of the record before that court); *Bradley v. Duncan*, 315 F.3d 1091, 1096 98 (9th Cir. 2002) (state court unreasonably found that evidence of police entrapment was insufficient to require an entrapment instruction), *cert. denied*, 540 U.S. 963 (2003).

II.     The Relationship Of § 2254(d) To Final Merits Adjudication

To prevail in federal habeas proceedings, a petitioner must establish the applicability of one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional invalidity of his custody under pre-AEDPA standards. *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) (en banc). There is no single prescribed order in which these two inquiries must be conducted. *Id.* at 736, 37. The AEDPA does not require the federal habeas court to adopt any one methodology. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

In many cases, § 2254(d) analysis and direct merits evaluation will substantially overlap.

/////

/////

/////

Accordingly, "[a] holding on habeas review that a state court error meets the § 2254(d) standard will often simultaneously constitute a holding that the [substantive standard for habeas relief] is satisfied as well, so no second inquiry will be necessary." *Frantz*, 533 F.3d at 736. In such cases, relief may be granted without further proceedings. *See, e.g., Goldyn v. Hayes*, 444 F.3d 1062, 1070 71 (9th Cir. 2006) (finding § 2254(d)(1) unreasonableness in the state court's conclusion that the state had proved all elements of the crime, and granting petition); *Lewis v. Lewis*, 321 F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) unreasonableness in the state court's failure to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge, and granting petition); *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) (finding § 2254(d)(1) unreasonableness in the state court's refusal to consider drug addiction as a mitigating factor at capital sentencing, and granting penalty phase relief).

In other cases, a petitioner's entitlement to relief will turn on legal or factual questions beyond the scope of the § 2254(d) analysis. In such cases, the substantive claim(s) must be separately evaluated under a de novo standard. *Frantz*, 533 F.3d at 737. If the facts are in dispute or the existence of constitutional error depends on facts outside the existing record, an evidentiary hearing may be necessary. *Id.* at 745; *see also Earp*, 431 F.3d 1158 (remanding for evidentiary hearing after finding § 2254(d) satisfied).

<u>DISCUSSION</u>

I.    <u>Motion to Suppress Evidence Found in Vehicle Trunk</u>

Petitioner argues that the trial court erred when it denied his motion to suppress evidence obtained from a green Saturn vehicle located on the front yard of his residence. As noted *supra*, he also argues that, if this claim fails for lack of standing, his trial counsel rendered ineffective assistance by failing to present evidence of standing.

A.    <u>Last Reasoned Decision</u>

The court of appeals denied this claim on direct appeal:

> Defendant contends that his Fourth Amendment rights were violated by the search of a vehicle in the front yard of his residence, and, if his claim fails for lack of standing, as the trial court concluded, his Sixth Amendment right to counsel was violated by his attorney, who failed to present evidence of standing. Neither contention has merit.

9

A.    Background

Before trial, on August 12, 2011, defendant filed a motion to suppress evidence obtained from the search of a green Saturn located in the front yard of his residence.  The search was based on two search warrants issued with respect to defendant's residence.

The first warrant specifically described two other vehicles but also included authorization to search "any vehicles under the control of [the real property] or the occupants of the premises to be searched, at the time the warrant is to be served as established by DMV documents and records, possession of keys or actual use of the vehicles and/or statements of the witnesses."

During the search under the first warrant, the officers found the green Saturn.  An officer asked defendant's mother who owned the vehicle, and the mother said it belonged to a friend named Yolanda, who had left the vehicle on her property.   A records check revealed that a release of liability was issued to defendant's mother.

An officer began to search the green Saturn under authorization of the first warrant.  He opened the trunk and found a rifle with a pistol grip handle.  Upon making this discovery, the search of the green Saturn was suspended and officers sought and obtained a second warrant specifically authorizing a search of the green Saturn.  The rifle found in the trunk of the green Saturn turned out to be the .30-caliber M1 carbine rifle used in the USA Gas incident.

In his motion to suppress, defendant argued: "There was never probable cause to justify a search of the green 1997 Saturn at issue, so the First Warrant was consequently overbroad and accordingly invalid as a basis for a search of that Saturn.  The Second Warrant, issued without any further probable cause than its predecessor, is tainted by the fruit of the poisonous tree gained from the First Warrant, as are any observations of and seizures from the green 1997 Saturn made under its authority."

Relying on the affidavits filed by the Stockton Police Department in support of the issuance of the two search warrants, defendant argued at the hearing on his motion to suppress that he had standing—a reasonable expectation of privacy—as to the green Saturn parked in the yard of his residence. On October 7, 2011, the trial court denied the motion to suppress, finding that the affidavits did not support defendant's standing argument.

On January 13, 2012, defendant requested permission to renew his motion to suppress, claiming that evidence had been discovered that defendant owned the green Saturn. A witness said the green Saturn belonged to defendant, it had a blown engine or other problem, and the witness and defendant sat in the vehicle to smoke marijuana. The witness never saw defendant work on the vehicle. The trial court granted the request to renew the motion to suppress, but defendant later, on May 1, 2012, withdrew the renewed motion because he was unable to locate the witness.

10

On December 10, 2012, defendant again requested permission to renew his motion to suppress, and the trial court granted the request. Defendant presented evidence of a witness's statements that (1) the green Saturn was parked on the lawn in front of defendant's residence, (2) it had been sitting in the same spot for several months, (3) the witness never saw defendant driving the vehicle, (4) the witness did not know whether defendant kept his belongings in the vehicle, (5) the vehicle did not run, (6) the witness and defendant entered the vehicle to smoke marijuana, (7) the witness never saw defendant work on the vehicle, and (8) the witness never saw anyone else enter the vehicle. Opposing the motion to suppress, the prosecution submitted a statement by defendant denying ownership or any possessory interest in the vehicle. Having reconsidered the motion to suppress, the trial court again denied it, finding that there was no standing.

B.      Analysis

Defendant asserts he presented sufficient evidence to establish standing to challenge the search of the green Saturn. In the alternative, he asserts his attorney violated his Sixth Amendment right to counsel by failing to submit available evidence of standing.

1. Standing

We need not determine whether the trial court erred with respect to the standing determination because, even assuming for the sake of argument defendant had standing to challenge the search of the green Saturn, defendant fails on appeal to establish prejudice in the trial court's determination that defendant did not have standing.

When a trial court errs with respect to a motion to suppress, we cannot reverse unless there is a miscarriage of justice. (Cal. Const., art. VI, § 13.) If the error was harmless beyond a reasonable doubt, there is no miscarriage of justice. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710, 87 S. Ct. 824]; *People v. Tewksbury* (1976) 15 Cal.3d 953, 972 [127 Cal. Rptr. 135, 544 P.2d 1335] [any error in denial of suppression motion analyzed under harmless beyond a reasonable doubt standard].)

In his appellate claim that the trial court's standing determination caused prejudice, defendant focuses on whether, without the evidence obtained from the green Saturn, including the rifle used in the USA Gas incident, it would have been more difficult to convict him. By focusing on that question, he neglects preliminary steps he must take to successfully establish prejudice. Specifically, he has failed to establish that, if the trial court had found standing, it would have necessarily found that his Fourth Amendment rights were violated, thus requiring suppression of evidence. Defendant is not entitled to assume that the motion to suppress would have been granted if the trial court found standing. We conclude that the motion to suppress would have been denied, even if the trial court had found standing, because the first warrant allowed the officers to search the green Saturn.

The first warrant issued with respect to defendant's residence allowed officers to search "any vehicles" on the property. That category included the green Saturn, which was on the front lawn. Therefore, the search of the green Saturn was done pursuant to a warrant.

Defendant notes in his opening brief that, in the trial court, he argued the first search warrant was overbroad to the extent the "any vehicles" language allowed a search of the green Saturn. However, he neither renews that argument in his opening brief nor cites authority for the proposition that the first warrant was overbroad to the extent the "any vehicles" language of the warrant allowed a search of the green Saturn. (*See People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal. Rptr. 2d 543, 897 P.2d 481] [failure to cite authority forfeits appellate review of issue].) On its face, the first warrant allowed a search of the green Saturn because it was within the scope of the "any vehicles" language of the warrant.

Even in his points and authorities in support of his motion to suppress before trial, where defendant argued that the first warrant was overbroad, he provided no authority for that proposition. He argued, without authority, that nothing in the affidavit supporting the search warrant connected defendant to the green Saturn.

In any event, the first warrant was not overbroad as to the "any vehicles" provision. Whether a warrant is sufficiently particular is a question of law subject to independent review by an appellate court. (*People v. Eubanks* (2011) 53 Cal.4th 110, 133 [134 Cal. Rptr. 3d 795, 266 P.3d 301].) In analyzing this question, we consider the purpose of the warrant, the nature of the items sought, and the totality of the circumstances surrounding the case. "A warrant that permits a search broad in scope may be appropriate under some circumstances, and the warrant's language must be read in context and with common sense. [Citation.]" (*Id.* at p. 134.)

Defendant was identified in the affidavit as the principal suspect in the crimes, and it was reasonable to believe he may have stashed evidence of his crimes in a vehicle on the premises other than the vehicles he had been seen driving. The same probable cause that connected defendant to the inside of the residence also connected him to the inoperative green Saturn on the front lawn. Thus, the first warrant was not overbroad in that it allowed the officers to search for evidence of the crimes in the green Saturn. The first warrant did not violate the Fourth Amendment, and the trial court would have properly denied his motion to suppress, even if it had found standing.

2. Effective Assistance of Counsel

In a video made by defendant, seized by law enforcement, provided to the defense, and used as evidence against defendant at trial, defendant briefly shows the green Saturn and refers to it as "my little Saturn." Defendant contends on appeal that his attorney's failure to provide this evidence in support of his standing to challenge the search of the green Saturn violated his right to counsel.

To prevail on his ineffective assistance claim, defendant must show (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693, 104 S. Ct. 2052] (*Strickland*).)

As to the first prong—deficient performance—a "strong presumption" exists that counsel acted professionally. (*Strickland*, *supra*, 466 U.S. at p. 689.)

As for the second prong—prejudice—"defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, 466 U.S. at p. 694.) "[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies… . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Id.* at p. 697.)

This is a case in which it is easy to dispose of the ineffectiveness claim based on the absence of prejudice. As discussed above, even if the trial court had found that defendant had standing to challenge the search of the green Saturn, it would have properly denied defendant's motion to suppress because the green Saturn was searched lawfully under the first warrant. Since there was no probability that counsel's failure to present the video evidence in connection with the motion to suppress would have produced a different result for defendant, his claim that his attorney violated his right to counsel is without merit.

ECF No. 12-1 at 7-12. Petitioner raised this claim again in a petition for review to the California Supreme Court (Lodg. Doc. No. 29), which summarily denied it (Lodg. Doc. No. 30).

    B.    <u>Relevant Federal Law</u>

        1.    <u>Fourth Amendment Claims</u>

The United States Supreme Court held, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). "The relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even whether the claim was correctly decided." *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996) (citations omitted) (superseded by statute on other grounds). And *Stone* remains good law after AEDPA. *Newman v. Wengler*, 790 F.3d 876 (9th Cir. 2015) (per curiam).

## 2. Assistance of Counsel

The clearly established federal law governing ineffective assistance of counsel claims is that set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a *Strickland* claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id.* at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id.* at 687-88 (internal quotation marks omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 687).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

## C. Analysis

Petitioner's Fourth Amendment claim is foreclosed by *Stone* insofar as he had a full and fair opportunity to litigate it in state court. Petitioner filed a motion to suppress, under California Penal Code § 1538.5, the evidence seized from the Saturn. 2 CT 553-56. The motion was heard and ultimately denied due to petitioner's lack of standing. 3 CT 760. The motion was subsequently renewed, further argument was presented, and denied again for lack of standing. 2 RT 354-58; 366-67; 372-73. The U.S. Court of Appeals for the Ninth Circuit has held that a motion to suppress under § 1538.5 is sufficient to afford a petitioner an opportunity for "full and fair" litigation of a Fourth Amendment claim. *Gordon v. Duran*, 895 F.2d 610, 613-14 (9th Cir. 1990).

And petitioner's ineffective assistance of counsel claim based on the failure to present evidence of standing fails for lack of prejudice. The court of appeal determined that, even if petitioner had proper standing, the search of the Saturn was permitted under the first warrant.

1    That decision was not unreasonable.  The first warrant included, as the court of appeals noted,

2    authorization to search "any vehicles under the control of [the real property] or the occupants of

3    the premises to be searched, at the time the warrant is to be served as established by DMV

4    documents and records, possession of keys or actual use of the vehicles and/or statements of

5    witnesses."  ECF No. 12-1 at 7-8.  This authorization was sufficiently particular.  The Ninth

6    Circuit has held that "[a] search warrant authorizing a search of a particularly described premises

7    may permit the search of vehicles owned or controlled by the owner of, and found on, the

8    premises."  *United States v. Duque*, 62 F.3d 1146, 1151 (9th Cir. 1995) (quoting *United States v.*

9    *Percival*, 756 F.2d 600, 612 (7th Cir. 1985)).  Finally, petitioner's argument that no probable

10   cause existed to search the Saturn is unpersuasive.  "Probable cause exists when there is a fair

11   probability that contraband or evidence of a crime will be found in a particular place."  *United*

12   *States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 46s U.S. 213, 238 (1983)).

13   The court of appeals reasonably determined:

14               Defendant was identified in the affidavit as the principal suspect in
             the crimes, and it was reasonable to believe he may have stashed
15           evidence of his crimes in a vehicle on the premises other than the
             vehicles he had been seen driving. The same probable cause that
16           connected defendant to the inside of the residence also connected
             him to the inoperative green Saturn on the front lawn.
17

18   ECF No. 12-1 at 11.

19        II.    Wiretap Evidence Claim

20        Petitioner argues that the trial court erred in denying his motion to suppress evidence

21   obtained by a wiretap of his phone.  He notes that the trial court denied his motion to unseal and

22   review attachments to the affidavit supporting investigators' request for the wiretap warrant.  It

23   also denied petitioner's motion to quash the wiretap warrant on grounds that the supporting

24   affidavit failed to establish probable cause.  He contends that: (1) this court must review the

25   sealed record of the *in camera* hearing and sealed attachments to the wiretap affidavit to

26   determine whether the trial court erred in declining to unseal them; and (2) that the portions of the

27   affidavit that have been unsealed fail to establish probable cause.

28   /////

A.      Last Reasoned Decision

The court of appeals issued the last reasoned decision when it denied this claim on direct appeal:

> In the trial court, defendant moved to suppress evidence obtained by wiretap, and the court denied the motion. On appeal, defendant contends (1) the court employed the wrong test for probable cause in considering the motion to suppress, (2) the documents attached to the wiretap request were improperly sealed, and (3) there was no probable cause supporting the wiretap authorization. As noted above, we conclude (1) the court employed the correct test for probable cause, (2) the documents attached to the wiretap request were properly sealed, and (3) there was probable cause to support the wiretap authorization.

> A defendant who believes that evidence was "obtained in violation of the Fourth Amendment of the United States Constitution or of [California's Wiretap Act] **FN2**" may move to suppress its use at trial. (§ 629.72.) Such a motion is "subject to review in accordance with the procedures set forth in Section 1538.5." (§ 629.72; see People v. Jackson (2005) 129 Cal.App.4th 129, 145–146 [28 Cal. Rptr. 3d 136] (Jackson).)

> **FN2**. We refer to the Presley-Felando-Eaves Wiretap Act of 1998 (§ 629.50 et seq.) as the Wiretap Act.

> Under the current version of the Wiretap Act, "the designated judge may authorize a wiretap if [1] there is probable cause to believe that an individual has committed, is committing, or is about to commit one or more of the listed crimes (§ 629.52, subd. (a)); [2] there is probable cause to believe that communications concerning the illegal activities will be obtained through that interception (§ 629.52, subd. (b)); [3] there is probable cause to believe that the communications device will be used by the person whose communications are to be intercepted (§ 629.52, subd. (c)); and [4] '[n]ormal investigative procedures have been tried and have failed or reasonably appear either to be unlikely to succeed if tried or to be too dangerous' (§ 629.52, subd. (d))." (People v. Leon (2007) 40 Cal.4th 376, 384 [53 Cal. Rptr. 3d 524, 150 P.3d 207] (Leon).)

> "The magistrate's determination of probable cause is entitled to deferential review. [Citations.]" (People v. Kraft (2000) 23 Cal.4th 978, 1041 [99 Cal. Rptr. 2d 1, 5 P.3d 68].)

> "The analysis of a [wiretap] suppression motion focuses on violations of the statutory procedures and not on constitutional violations, because while it is possible to violate a core principle of the statute without violating the Fourth Amendment it would not seem possible to violate the Fourth Amendment without also violating a core statutory principle." (Jackson, supra, 129 Cal.App.4th at p. 149.) Therefore, the first question to be answered in analyzing a motion to suppress wiretap evidence is whether the defendant established a violation of the Wiretap Act. If the defendant

16

did not establish a violation of the Wiretap Act, there is no constitutional violation and no suppression. (*Jackson*, at p. 149.)

A. *Background*

During the investigation of defendant's crimes, the district attorney's office filed an application for a wiretap authorization. The application asserted that: (1) defendant committed murder and other crimes; (2) a wiretap of his cell phone would yield evidence of the crimes; (3) the cell phone was commonly used by defendant; and (4) normal investigative techniques were ineffective or too dangerous.

In support of the wiretap application, the district attorney's office filed an affidavit of Detective Kathryn Nance of the Stockton Police Department. The affidavit described defendant and identified his cell phone. It also set forth facts relating to nine incidents that Detective Nance asserted were support for the necessary probable cause determinations.

In Incident One, someone pulled up in a black and gray Lexus next to Roberto Hernandez and shot at him. Hernandez was not struck, but his car was. He knew who the gunman was but would not identify the gunman to the officer who spoke to him.

In Incident Two, someone shot Roberto Hernandez and Alejandro Salazar. Hernandez died of his injuries. Salazar told the officer that he believed defendant was the gunman because there had been problems between Hernandez and defendant. Salazar had heard that defendant was responsible for the shooting in Incident One. Defendant, in a purple Buick, had been following Hernandez and Salazar earlier that day. Salazar identified a photo of defendant. Jose Cordova was present during the shooting but did not see the gunman. Hernandez had told him earlier that he had some problems with some "black people." David Jimenez saw the shooting and saw a person with dark skin, wearing a hoodie, in an area where shell casings were later found. Jorge Sanchez said he had seen defendant in a purple Buick and had heard he also drove a Lexus. Sanchez saw the shooting and said that an "Asian guy and a black guy were shooting from the bushes." Sanchez did not know defendant but heard that defendant was the one who shot at Hernandez. A police detective questioned defendant about the shooting. Defendant told the detective he had a gray Lexus and a purple Buick. Defendant gave the detective his cell phone number, and the detective later called defendant and talked to him at that number.

In Incident Three, someone in a group of men on foot shot at a passing car, killing one of its occupants. Defendant's Lexus was found in the area, but defendant did not appear to claim his car.

In Incident Four, an anonymous caller said he saw defendant in a purple car, along with other Black males, get into an argument with Hispanic males in a white car. Eventually, gunfire was exchanged. The caller was upset that defendant had not been arrested for killing Hernandez, and the caller reported that defendant had an AK-47-type

17

rifle. An independent report verified that there had been gunfire in the area at the time reported by the anonymous caller.

In Incident Five, an anonymous caller said that several Black and Hispanic males were inside a vacant house with AK-47 rifles. When officers arrived at the vacant house, someone peeked out a side door and immediately went back in. Several Black and Hispanic males ran out of the house, escaping through backyards. The officers found two rifles inside the house. A confidential attachment to the affidavit in support of the wiretap request related to this incident.

In Incident Six, a Black male shot at a group of Hispanic males, hitting three of them. When shown a photo lineup including defendant, one of the victims said he thought that defendant looked like the gunman.

In Incident Seven, a Black male and another person shot at two victims as they sat in their car near the USA Gas station. Both victims were injured, and one of them died. Earlier that evening, defendant's cousin Maurice had been in an altercation with friends of the victims at a nightclub in Modesto. Several anonymous callers reported to officers that defendant told them that he was one of the gunmen involved in the USA Gas incident and was the gunman involved in the death of Roberto Hernandez, and the deceased victim's father also heard that his son had been killed by defendant.

In Incident Eight, a detective drove to defendant's home and watched while defendant answered a phone call from another detective. They did this to verify that the phone was in defendant's possession.

Incident Nine was detailed in a confidential attachment because it involved information from a confidential informant who had been reliable in giving information to the Stockton Police Department in the past. We need not give the details of this confidential attachment.

The incidents all took place from October 2009 to February 2010.

Based on the incidents summarized in the application for wiretap authorization, Detective Nance expressed the belief that "[defendant] is responsible and involved in the aforementioned cases. He is closely tied with all of the people described above and has been named as being involved by Confidential Reliable Informants, anonymous callers and victims of the above-described crimes. Based on the information obtained up to this point in the investigation, your affiant believes that he was not acting alone while committing the crimes. At this point in the investigation, the other people involved have not been identified or located. It is believed that [defendant] is in contact with these [co]conspirators. It is believed that [defendant] will have further communications about the prior crimes and other shootings being planned and the intended victims."

Detective Nance also gave facts concerning the Stockton Police Department's use of available investigative approaches and the necessity for using a wiretap to obtain further evidence. We need not provide those details here.

18

The judge authorized the wiretap and ordered that the application and court order be sealed.

Before trial, defendant asked the court to unseal the attachments to Detective Nance's affidavit in support of the wiretap request. Defendant also moved to suppress evidence obtained as a result of the wiretap.

The trial court denied the motion to unseal the attachments and denied the motion to suppress evidence obtained as a result of the wiretap, finding, under the totality of the circumstances, there was probable cause to issue the wiretap authorization.

B. *Analysis*

1. *Probable Cause Test*

Defendant claims that the trial court erred by testing the reliability of the affidavits filed in support of the wiretapping order using a totality of the circumstances test rather than employing a standard that requires particularized corroboration of informant tips, a test known as the *Aguilar-Spinelli* test (*Aguilar v. Texas* (1964) 378 U.S. 108 [12 L.Ed.2d 723, 84 S. Ct. 1509] (*Aguilar*); *Spinelli v. United States* (1969) 393 U.S. 410 [21 L.Ed.2d 637, 89 S. Ct. 584] (*Spinelli*)). Defendant claims that, although the United States Supreme Court discarded the *Aguilar-Spinelli* test in favor of a totality-of-the-circumstances test in *Illinois v. Gates* (1983) 462 U.S. 213 [76 L.Ed.2d 527, 103 S. Ct. 2317] (*Gates*), affidavits in support of wiretap authorizations in California must be tested using the *Aguilar-Spinelli* test because (1) the Wiretap Act was enacted after Proposition 8's truth-in-evidence provision was added to the California Constitution and (2) the Wiretap Act was passed by at least a two-thirds vote in each house of the Legislature, thus excepting it from the truth-in-evidence provision. The contention is without merit because, even though the wiretap statute was adopted by a two-thirds vote of each house of the Legislature after Proposition 8 was passed, there is no indication that the Legislature intended to adopt the Aguilar-Spinelli test. In other words, the Legislature could have, but did not, adopt the Aguilar-Spinelli test for wiretap probable cause determinations.

In the 1960's, the United States Supreme Court formulated a test to determine whether allegations of an informant, supplied to the magistrate by hearsay, are sufficient to establish probable cause for a warrant (in general, and not necessarily with respect to a wiretap authorization). This Aguilar-Spinelli test required that the affidavit in support of the warrant (1) allege the informant's statement in factual, rather than conclusionary, language and establish the informant's personal knowledge and (2) contain sufficient underlying factual information reasonably supporting the informant's credibility and the information's reliability. (*Aguilar, supra*, 378 U.S. 108; *Spinelli, supra*, 393 U.S. 410; see also *People v. Smith* (1976) 17 Cal.3d 845, 850 [132 Cal. Rptr. 397, 553 P.2d 557].)

The California Supreme Court used the Aguilar-Spinelli test, as mandated by the binding United States Supreme Court precedents of Aguilar and Spinelli, to review California probable cause determinations. (*See People v. Smith*, *supra*, 17 Cal.3d at p. 850.) According to the California Supreme Court, the *Aguilar-Spinelli* test was "'a convenient shorthand articulation of previously established principles of California law in the area of hearsay affidavits.' [Citation.]" (*People v. Belmontes* (1988) 45 Cal.3d 744, 768, fn. 3 [248 Cal. Rptr. 126, 755 P.2d 310] (*Belmontes*), overruled on other grounds in *People v. Cortez* (2016) 63 Cal.4th 101, 118 [201 Cal. Rptr. 3d 846, 369 P.3d 521], and *People v. Doolin* (2009) 45 Cal.4th 390, 421 [87 Cal. Rptr. 3d 209, 198 P.3d 11].)

In *Gates*, decided in 1983, the United States Supreme Court "abandon[ed]" the two-pronged *Aguilar-Spinelli* test for determining probable cause and in its place adopted a "totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations." (*Gates*, *supra*, 462 U.S. at pp. 238, 233.) The court described the new test: "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for … [concluding]' that probable cause existed. [Citation.]" (*Id.* at pp. 238–239.) The Gates court reasoned that the totality of the circumstances test is a "'practical, nontechnical conception.'" (*Id.* at p. 231.) Therefore, the court concluded that the "rigid" "two-pronged [*Aguilar-Spinelli*] test" was not suitable for testing probable cause. (*Gates*, *supra*, 462 U.S. at pp. 230–231 & fn. 6.)

Before 1982, California courts imposed their own rules and tests on the admissibility and exclusion of evidence obtained by search and seizure. Many of these rules and tests were based on independent state grounds more restrictive, as to admission of evidence, than was required by the United States Constitution, as interpreted by the United States Supreme Court. (*See, e.g., People v. Brisendine* (1975) 13 Cal.3d 528, 548–552 [119 Cal. Rptr. 315, 531 P.2d 1099] (*Brisendine*), abrogated by Prop. 8 [independent state grounds].)

In 1982, California voters passed Proposition 8, eliminating independent state grounds as a means for exclusion of evidence. The truth-in-evidence provision of Proposition 8 prohibited exclusion of relevant evidence unless the United States Constitution requires exclusion. As an exception, Proposition 8 allowed exclusion of relevant evidence admissible under the United States Constitution only if a subsequent statute, passed by a two-thirds vote of each house of the Legislature, provided for exclusion. **FN3** (Cal. Const., art. I, § 28, subd. (f)(2).) "Proposition 8 … eliminate[d] a judicially created remedy for violations of the search and seizure provisions of the federal or state Constitutions, through the exclusion of evidence so obtained, except to the extent that exclusion remains federally compelled." (*In re Lance W.* (1985) 37 Cal.3d 873, 886–887 [210

Cal. Rptr. 631, 694 P.2d 744], italics omitted.) The California Supreme Court concluded that "*Brisendine* and other state-law-based search-and-seizure cases were superseded by the enactment of Proposition 8. (See Cal. Const., art. I, § 28, subd. [(f)(2)] [right to truth-in-evidence provision]; *In re Lance W.*[, supra,] 37 Cal.3d 873 [210 Cal. Rptr. 631, 694 P.2d 744] [upholding same].)" (*People v. Monge* (1997) 16 Cal.4th 826, 873, fn. 4 [66 Cal. Rptr. 2d 853, 941 P.2d 1121].)

**FN3**.   "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding … ." (Cal. Const., art. I, § 28, subd. (f)(2).)

After the United States Supreme Court decided *Gates* in 1983, Proposition 8 had the effect of prohibiting California courts from using the two-pronged *Aguilar-Spinelli* probable cause test because use of that test could result in exclusion of evidence that would be admissible under the *Gates* totality of the circumstances test. As California courts have recognized since *Gates* was decided, the truth-in-evidence provision requires that the *Gates* totality of the circumstances test must be applied in California to determine probable cause for crimes committed after enactment of Proposition 8, not the more rigid *Aguilar-Spinelli* test abandoned by the United States Supreme Court. (See *People v. Love* (1985) 168 Cal.App.3d 104, 107–108 [214 Cal. Rptr. 483] [applying *Gates*]; *People v. Medina* (1985) 165 Cal.App.3d 11, 16–18 [211 Cal. Rptr. 216] [same]; see also *Belmontes*, *supra*, 45 Cal.3d at p. 768, fn. 3 [applying *Aguilar-Spinelli* because crime committed before Prop. 8]; *People v. Kershaw* (1983) 147 Cal.App.3d 750, 754, fn. 2 [195 Cal. Rptr. 311] [same].)

Six years after Proposition 8 passed, the Legislature adopted the Wiretap Act and later amended it in 1995, as relevant here. (Stats. 1988, ch. 111, § 2, p. 450; Stats. 1995, ch. 971, § 10, p. 7395.) This act "authorized specified law enforcement officials to apply for a court order to intercept wire communications, but only where there was probable cause to believe the target was involved in [specified crimes]." (*Leon*, *supra*, 40 Cal.4th at p. 383.) So the Wiretap Act is a post-Proposition 8 statute passed by a two-thirds vote of each house of the Legislature. "By its terms the truth-in-evidence clause [of Proposition 8] does not apply to a statute 'hereafter enacted by a two-thirds vote of the membership in each house of the Legislature.' Section 629.72 [providing for exclusion of evidence] was enacted in 1995, 13 years after the adoption of the truth-in-evidence clause. At the time of its enactment there were 40 members of the Senate. The bill passed the Senate by a vote of 28 to two (92 percent). There were 80 members of the Assembly. The bill passed by a vote of 62 to five (77.5 percent). Thus, suppression of evidence under section 629.72 is not prohibited by the truth-in-evidence clause of the California Constitution." (*Jackson*, *supra*, 129 Cal.App.4th at pp. 152–153, fns. omitted.) We therefore look to the terms of the Wiretap Act to determine what test to apply in evaluating whether evidence obtained by wiretap must be suppressed.

Matters of statutory interpretation are questions of law subject to de novo review. (*People v. Simmons* (2012) 210 Cal.App.4th 778, 790 [148 Cal. Rptr. 3d 554].) When we construe a statute, we seek to determine and give effect to what the Legislature intended. And the most reliable indicator of what the Legislature intended is found in the words used. (*People v. King* (2006) 38 Cal.4th 617, 622 [42 Cal. Rptr. 3d 743, 133 P.3d 636].)

The Wiretap Act allows a defendant to move to suppress evidence obtained by wiretap "only on the basis that the contents or evidence were obtained in violation of the Fourth Amendment of the United States Constitution or of this chapter." (§ 629.72.) Notably, this provision does not provide for suppression of evidence if it is obtained in violation of the California Constitution. The omission of other reasons for exclusion is evidence of the Legislature's intent to limit exclusion to violations of (1) the United States Constitution, which uses the Gates totality of the circumstances test, and (2) violations of the Wiretap Act. However, defendant argues that the language includes exclusion of evidence obtained in violation of the California Constitution, invoking the Aguilar-Spinelli test, because, in his words, "[t]he probable cause requirement of the statutory scheme flows from … the California Constitution and thus plays a central role in the wiretap statute and cannot be satisfied by other means." (Fn. omitted.) This argument, though creative, is unconvincing because nothing in the Wiretap Act evinces a legislative intent to adopt the abandoned *Aguilar-Spinelli* test as an independent state ground for exclusion of evidence.

In attempting to establish that the Legislature meant to adopt the *Aguilar-Spinelli* test, defendant focuses on section 629.50, which requires the judge to make probable cause determinations when considering whether to authorize a wiretap. **FN4** The statute does not designate what probable cause test to use. According to defendant, this failure to designate a probable cause test necessarily means that the *Aguilar-Spinelli* test must be used because it is California's probable cause test, as seen in the cases in which the crimes were committed before Proposition 8 was passed. This argument, however, contradicts the Legislature's express limitation of grounds for exclusion to violations of the Fourth Amendment and of the Wiretap Act. (§ 629.72.) Section 629.50 does not designate the test to be used in the probable cause determination and does not evince a legislative intent to exclude evidence when a violation is determined using the *Aguilar-Spinelli* test. More likely, the Legislature, by not designating a test or including reference to the California Constitution, intended the courts to use the same test used in all other probable cause determinations in California—the Gates totality of the circumstances test. (See *People v. Love*, *supra*, 168 Cal.App.3d at pp. 107–108 [applying *Gates*]; see also *In re Lance W.*, *supra*, 37 Cal.3d at p. 896 [Legislature did not intend to abrogate truth-in-evidence provision by reenactment of § 1538.5].).)

**FN4.** For example, section 629.50 requires the court to determine whether probable cause supports a belief that "additional communications of the same type will occur thereafter" and, in the case of modification of a wiretap authorization, "the person or

persons identified in the original order have commenced to use a facility or device that is not subject to the original order." (§ 629.50, subd. (a)(5) & (8).)

If the Legislature, when enacting the Wiretap Act, had intended to adopt the *Aguilar-Spinelli* test for determining probable cause and deciding whether to exclude evidence obtained by wiretap, it could have done so expressly. It did not. Instead, it expressly authorized exclusion of evidence only for violation of the Fourth Amendment (which invokes the *Gates* totality of the circumstances test) or a violation of the Wiretap Act itself. This inclusion of two bases for suppression and the omission of reference to the California Constitution or a violation of rights determined using the *Aguilar-Spinelli* test is compelling evidence the Legislature did not intend to exclude evidence as a result of the application of the *Aguilar-Spinelli* test. (*People v. Superior Court* (*Ramirez*) (1999) 70 Cal.App.4th 1384, 1391 [83 Cal. Rptr. 2d 402] [presumption that omission in statute is intentional].)

Finally, the Legislature intended the Wiretap Act to conform to federal law, as reflected in title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. § 2510 et seq.). (*People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1196 [105 Cal. Rptr. 2d 187].) Exclusion under federal law is necessary only for violation of the Fourth Amendment or of the federal wiretap statute, not for any California-specific reason.

Nothing in the Wiretap Act or its history convinces us the Legislature intended to adopt the *Aguilar-Spinelli* test for determining probable cause in support of wiretap authorization. Therefore, the trial court correctly applied the *Gates* totality of the circumstances test.

2. *Sealing of Documents*

On appeal, defendant asks us to review the sealed record of the in camera proceedings, held in accordance with *People v. Hobbs* (1994) 7 Cal.4th 948 [30 Cal. Rptr. 2d 651, 873 P.2d 1246] (*Hobbs*). Having reviewed the sealed record, we conclude that the court fully complied with Hobbs and correctly ordered the two attachments to Detective Nance's affidavit to be sealed.

A defendant may move to suppress evidence obtained as the result of a search warrant on the ground there was no probable cause for the issuance of the warrant. (§ 1538.5, subd. (a)(1)(B)(iii).) Under *Hobbs*, "[o]n a properly noticed motion by the defense seeking to quash or traverse [a] search warrant" where any part of the search warrant affidavit has been sealed, "the lower court should conduct an in camera hearing … . It must first be determined whether sufficient grounds exist for maintaining the confidentiality of the informant's identity. It should then be determined whether the entirety of the affidavit or any major portion thereof is properly sealed, i.e., whether the extent of the sealing is necessary to avoid revealing the informant's identity." (*Hobbs*, *supra*, 7 Cal.4th at p. 972, fn. omitted.)

We independently review the court's decision to seal a portion of the search warrant affidavit. (See *People v. Martinez* (2005) 132 Cal.App.4th 233, 241–242 [33 Cal. Rptr. 3d 328].) Based upon our review of the transcripts of the in camera proceedings and the attachments to Detective Nance's affidavit, we conclude that the court did not err in refusing to unseal the entire search warrant affidavit or in determining which portions had to remain under seal in order to maintain the confidentiality of confidential informants.

3. *Wiretap Authorization*

Defendant contends that evidence obtained by wiretap should have been suppressed because unsealed parts of Detective Nance's affidavit did not support the necessary probable cause determinations connecting defendant to the crimes. In making this contention, defendant applies the two-pronged *Aguilar-Spinelli* test, attacking the reliability and credibility of the affiant. However, as we established above, the *Aguilar-Spinelli* test does not apply to a motion to suppress evidence obtained by wiretap. As a result, defendant's contention that Detective Nance's affidavit did not provide sufficient reliable and credible evidence to support the necessary probable cause determination applies the wrong test and is therefore without merit. Defendant's attack on the wiretap authorization could succeed on appeal only if he were to establish that the trial court erred under the totality of the circumstances test. He makes no attempt to do that, so he fails to establish that there was insufficient evidence to support the necessary probable-cause determinations in authorizing a wiretap. (See *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573 [43 Cal. Rptr. 3d 741] [appellant bears burden of affirmatively establishing error].) In any event, Detective Nance's affidavit, including the sealed parts, recounted several sources identifying defendant's probable involvement in the murders and the need for a wiretap to develop the case against him and to identify any others involved in the crimes.

ECF No. 12-1 at 13-25. Petitioner raised this claim again in a petition for review to the California Supreme Court (Lodg. Doc. No. 29), which summarily denied it (Lodg. Doc. No. 30).

           B.     <u>Relevant Federal Law</u>

     The Supreme Court's decision in *Stone v. Powell*, referenced *supra* in the foregoing section, applies with equal measure here.

           C.     <u>Analysis</u>

     *Stone* bars the Fourth Amendment claim asserted here because petitioner had a full and fair opportunity to litigate the claim at the state level. 428 U.S. 465, 494 (1976). Petitioner litigated this claim extensively and received reasoned decisions at both the trial and appellate court levels. And, to the extent petitioner's claim is based on an alleged violation of 18 U.S.C.

§§ 2510-2520, i.e., the Omnibus Crime Control and Safe Streets Act of 1968, it must still be rejected. *See Key v. Walker*, 2009 U.S. Dist. LEXIS 119131, *84, 2009 WL 3878070 (N.D. Cal. Nov. 17, 2009) ("[T]here is no clearly established Supreme Court precedent holding that a violation of [Title III of the Omnibus Crime Control and Safe Streets Act of 1968] may result in a due process claim cognizable in federal habeas corpus.").

Based on the foregoing, relief is foreclosed on this claim.

III.     *Motion to Sever*

Petitioner argues that the trial court erred when it denied his motion to sever the counts related to the Skyline incident from those related to the USA Gas incident.

A.     Last Reasoned Decision

The court of appeals issued the last reasoned decision when it denied this claim on direct appeal:

> Defendant contends the trial court abused its discretion by denying his motion to sever the Skyline incident from the USA Gas incident for trial. The contention is without merit.
>
>  A. *Procedure*
>
> Defendant moved to sever the Skyline counts from the USA Gas counts. He claimed: (1) the evidence of the two incidents would not be cross-admissible because there was no similar motive, plan, or weapons used between the two incidents; (2) he USA Gas facts were more inflammatory than the Skyline facts; and (3) the evidence of his guilt of the Skyline crimes was weaker than the evidence of his guilt of the USA Gas crimes.
>
> The trial court denied the motion and denied it again when defendant subsequently renewed it. The court found that the evidence supporting both incidents was strong, there was cross-admissibility of evidence as to motive (revenge) and common plan (ambush), and neither incident would "unusually inflame the jury against the defendant."
>
> B. *Law*
>
> Section 954 permits the joinder of "two or more different offenses of the same class of crimes or offenses." The law favors joinder of counts because it promotes efficiency. (*People v. Myles* (2012) 53 Cal. 4th 1181, 1200.) Even when joinder is proper, the trial court may, "in the interests of justice and for good cause shown," exercise its discretion to order that different offenses or counts to be tried separately. (§954; see *People v. Thomas* (2012) 53 Cal. 4th 771, 798 (*Thomas*).) " ' "The burden is on the party seeking severance to

25

clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation]' " (*People v. Bradford* (1997) 15 Cal. 4th 1229, 1315.)

If the trial court denies a motion to sever, the ruling is reviewed on appeal for abuse of discretion. (*People v. Ramirez* (2006) 39 Cal. 4th 398, 439.) "In assessing potential prejudice, we examine the record before the trial court at the time of its ruling. The relevant factors are whether (1) the evidence would be cross-admissible in separate trials, (2) some charges are unusually likely to inflame the jury against the defendant, (3) a weak case has been joined with a strong case, or with another weak case, so that the total evidence may unfairly alter the outcome on some or all charges, and (4) one of the charges is a capital offense, or joinder of the charges converts the matter into a capital case. [Citations.]" (*People v. Zambrano* (2007) 41 Cal. 4th 1082, 1128-1129, disapproved on another ground by *People v. Doolin* (2009) 45 Cal. 4th 390, 421 & fn. 22.)

Cross-admissibility in both directions is not required. It is sufficient if evidence of one crime is cross-admissible as to the other crime. (*People v. Zambrano, supra,* 41 Cal. 4th at p. 1129 ["it is not enough that the assaults were admissible in the murder case; 'two-way' cross admissibility is not required"]; *People v. Cunningham* (2001) 25 Cal. 4th 926, 985 ["complete cross-admissibility is not necessary to justify the joinder of counts"].)

C. *Analysis*

Defendant renews his argument on appeal. He contends that the trial court abused its discretion by denying the motion to sever because: (1) the incidents were not cross-admissible, (2) the facts of the USA Gas crimes were inflammatory, (3) the stronger USA Gas case bolstered the weaker Skyline case, (4) joinder converted the action into a capital case, and (5) the benefits of joinder were minimal.

Basing its decision on the evidence produced at the preliminary hearing, the trial court properly denied defendant's motion to sever because the incidents were cross-admissible – the motive and the plan were the same, supporting an inference that defendant committed both crimes.

Defendant committed both shootings in revenge: the Skyline shootings were defendant's response to his perception that Hernandez and his friends had disrespected him and shot at him, and the USA Gas shootings were defendant's response to his friend being punched at a nightclub earlier that evening. Defendant claims, because he was not personally involved in the fight at the nightclub, the USA Gas shootings were not revenge. To the contrary, defendant committed the USA Gas shootings in revenge because his friend was hit at the nightclub in Modesto that night.

Defendant committed both shootings by ambushing the victims: defendant hid behind a bush and shot the unsuspecting victims in the Skyline incident, and defendant approached from behind the parked car at the USA Gas station and opened fire, thus pouncing on the

victims unsuspectedly in both incidents.  In each incident, he used a semiautomatic firearm and fired numerous shots quickly.

" 'Pursuant to Evidence Code section 1101, subdivision (b), evidence that a defendant has committed an offense, although inadmissible to demonstrate that a defendant's disposition to commit crimes, may be received to establish, among other things, identity, intent, motive, or plan.  To be admissible to demonstrate a distinctive modus operandi, the evidence must disclose common marks or identifiers, that, considered singly or in combination, support a strong inference that the defendant committed both crimes. [Citations.]' " (*People v. Carter* (2005) 36 Cal. 4th 1114, 1154-1155, italics omitted.)  The crimes need not be identical, but they must have commonalities, to be cross-admissible.  (*Id.* at p. 1155.)  Here, the commonalities (revenge and ambush) were sufficient to find cross-admissibility.

Cross-admissibility dispels any inference of prejudice. (*People v. Bradford*, *supra*, 15 Cal. 4th at p. 1316.)  However, even assuming the two incidents were not cross-admissible, the trial court did not abuse its discretion under the remaining relevant factors by denying the motion to sever the two incidents.

First, the two incidents were both violent and egregious.  To say that the USA Gas crimes were more inflammatory than the Skyline crimes is to get unnecessarily and unworkably fine in trying to predict a jury's reaction to such malevolent actions.

Second, the evidence of defendant's guilt as to one incident was not substantially stronger than the evidence as to the other incident.  As to the Skyline incident, the evidence showed that defendant threatened to kill the victims within an hour before the shootings.  The description of the gunman fit defendant, including the sweatshirt defendant was wearing when he threatened the victims.  Cell phone records placed defendant in the vicinity of the shootings.  And Salazar identified defendant as the gunman.  As to the USA Gas incident, cell phone records again placed defendant in the vicinity of the shootings.  And testing established that the M1 carbine rifle in the trunk of the green Saturn on defendant's front lawn was used in the shootings.

And third, although the joinder made possible the multiple-murder special circumstance allegation, defendant proffers no authority that just this one factor alone supports a finding that the trial court abused its discretion in denying the motion to sever.

We therefore conclude that the trial court did not abuse its discretion by denying the motion to sever and defendant has not established that joinder of the two incidents for trial "actually resulted in 'gross unfairness,' amounting to a denial of due process." (*People v. Arias* (1996) 13 Cal.4th 92, 127.)

Lodg. Doc. No. 12-1 at 25-29.  Petitioner raised this claim again in a petition for review to the

California Supreme Court (Lodg. Doc. No. 29), which summarily denied it (Lodg. Doc. No. 30).

B.    Relevant Federal Law

The Supreme Court has never held that a trial court's denial of a motion to sever, standing alone, can violate the constitution. *See Grajeda v. Scribner*, 541 F. App'x 776, 778 (9th Cir. 2013). In *United States v. Lane*, the Supreme Court did note that "misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." 474 U.S. 438, 446 n.8 (1986). The Ninth Circuit has concluded that this language in *Lane* is dicta, however, and thus does not constitute "clearly established federal law." *See Collins v. Runnels*, 603 F.3d 1127, 1132 (9th Cir. 2010). In *Collins*, the Ninth Circuit held:

> The language upon which Collins refers is dicta. *Lane* dealt with the joinder of standards under Federal Rules of Criminal Procedure 8 and 52; no constitutional issue was before the Court. "[T]he phrase 'clearly established Federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (emphasis added). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). The footnote upon which Collins relies did not set forth the governing legal principle in *Lane*. It was merely a comment.

*Id.*

In *Zafiro v. United States*, the Supreme Court held that federal courts should sever "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." 506 U.S. 534, 539 (1993). The Ninth Circuit subsequently ruled that the *Zafiro* decision spoke to "only the Federal Rules of Criminal Procedure applicable to federal district courts." *Collins*, 603 F.3d at 1131-32 ("By its own wording, *Zafiro* only applies to federal and not state court trials.").

There is, however, Ninth Circuit authority indicating that a habeas petitioner may prevail on a severance claim if he can demonstrate that the state trial court's denial of his motion to sever rendered his trial "fundamentally unfair." *See Grisby v. Blodgett*, 130 F.3d 365, 370 (9th Cir. 1997). This prejudice exists where "the impermissible joinder had a substantial and injurious

/////

effect or influence in determining the jury's verdict." *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000).

C.    <u>Analysis</u>

As noted above, there is no clearly established federal law holding that a trial court's erroneous denial of a motion to sever violates the constitution. Thus, petitioner can succeed only if he establishes that the decision to disallow severance rendered his trial fundamentally unfair. He cannot. As noted *supra*, the court of appeal determined that both of the incidents in question were "violent and egregious" and the evidence of his guilt was not substantially stronger as to one incident and, consequently, denial of severance had not resulted in "'gross unfairness' amounting to denial of due process." ECF No. 12-1 at 28-29. A federal court may not grant habeas relief unless no reasonable jurist could agree with the state court's determination. *See Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."). Such a determination is simply not possible here and this claim must be denied.

IV.    <u>Instructions on Lesser Included Offenses</u>

Petitioner argues that the trial court violated his constitutional rights by not instructing, sua sponte, on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter with respect to the Skyline incident. He also argues, in his traverse, that his trial counsel was ineffective in failing to request jury instructions on those lesser included offenses.

A.    <u>Last Reasoned Decision</u>

The court of appeals issued the last reasoned decision when it denied this claim on direct appeal:

> Defendant contends that the trial court erred by not instructing, sua sponte, on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter as they related to the Skyline incident. We conclude that the trial court did not err because, even assuming without deciding that the trial court should have given the instructions, it is not reasonably probable that the failure to give the instructions affected the outcome.

29

## A. *Background*

Defendant limits this contention to the Skyline incident (counts 1 & 2) and does not make the same contention as to the USA Gas incident. **FN5.**

**FN5** Defendant misidentifies the count numbers in his opening brief, but the context and argument make it clear that he is making the contention only as to counts 1 and 2.

As to count 1 (the Skyline murder of Hernandez), the court instructed the jury concerning the elements of murder, including malice. The court also instructed the jury that it could render a verdict of first degree murder if it found that he (1) acted willfully, deliberately, and with premeditation or (2) committed the murder by lying in wait. If the jury found murder, but not first degree murder, it was required to render a second degree murder verdict.

The jury convicted defendant of first degree murder on count 1.

As to count 2 (the Skyline attempted murder of Salazar) the court instructed the jury concerning the elements of attempted murder. The court also instructed the jury that, if it found defendant guilty of attempted murder, it would then be required to determine whether the attempted murder was done with deliberation and premeditation. The instruction included a definition of deliberation, meaning he "carefully weighed the considerations for and against his choice, and knowing the consequences, decided to kill." The court cautioned the jury that "[a] decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated."

The jury convicted defendant of attempted murder on count 2. It also found that the attempted murder was willful, deliberate, and premeditated.

The court did not instruct on voluntary manslaughter or attempted voluntary manslaughter.

## B. *Law*

A trial court must instruct on all lesser included offenses supported by the evidence presented at trial. Substantial evidence is evidence from which a reasonable jury could conclude that the lesser offense, but not the greater, was committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)

Murder is the unlawful killing of a human being with malice aforethought (§187, subd. (a).) Manslaughter is the unlawful killing of a human being without malice. (§192.) Voluntary manslaughter may occur in two limited circumstances: when the defendant acts in a sudden quarrel of heat of passion, or when the defendant kills in an unreasonable but good faith belief in having to act in self-defense. (*People v. Barton* (1995) 12 Cal.4th 186, 199.) Here, defendant does

not assert the evidence supported instructions on imperfect self-defense, so we consider only whether he acted in a heat of passion.

Similarly, attempted murder is commission of a direct but ineffectual step toward killing someone while intending to kill. (*People v. Stone* (2009) 46 Cal.4th 131, 136.) For purposes of sentence enhancement, the prosecution may seek an additional jury finding that an attempted murder was willful, deliberate, and premeditated. (§664, subd. (a)); *People v. Bright* (1996) 12 Cal.4th 652, 669, overruled on another ground in *People v. Seel* (2004) 34 Cal.4th 535, 550, fn. 6.) Attempted murder may be reduced to attempted involuntary manslaughter if the defendant attempted to kill in a heat of passion. (*People v. Van Ronk* (1985) 171 Cal.App.3d 818, 824.)

In the context of voluntary manslaughter based on a killing done in the heat of passion, there must be provocation sufficient to arouse the passions of a reasonable person under the same circumstances. The fundamental inquiry is whether the defendant's reason was " ' "so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " (*People v. Wickersham* (1982) 32 Cal.3d 307, 326, overruled on another ground in *People v. Barton* (1995) 12 Cal.4th 186, 200-201.)

To be entitled to voluntary manslaughter instructions under a heat of passion theory, "the killing must be 'upon a sudden quarrel or heat of passion' (§ 192); that is, 'suddenly as a response to the provocation, and not belatedly as revenge or punishment. Hence, the rule is that, if sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter.' " (*People v. Daniels* (1991) 52 Cal.3d 815, 868.)

Adequate provocation must be affirmatively demonstrated; it cannot be left to speculation. (*People v. Williams* (1969) 71 Cal.2d 614, 624.)

C. *Analysis*

Defendant argues that the trial court should have given the voluntary manslaughter and attempted voluntary manslaughter instructions with respect to the Skyline incident because there was evidence that some time before the Skyline incident, on the same day, perhaps with a half-hour before the Skyline shootings, someone shot at defendant from Hernandez's car, thus provoking defendant to a heat of passion. We need not determine whether the trial court had a duty to instruct on voluntary manslaughter or attempted voluntary manslaughter because the jury necessarily concluded that defendant did not act in a heat of passion – it found that defendant acted willfully, deliberately, and with premeditation, which is inconsistent with heat of passion.

"[A] trial court's failure to instruct on a lesser included offense is not prejudicial if, as here, the jury necessarily resolved the factual

question adversely to the defendant under other instructions." (*People v. Mincey* (1992) 2 Cal.4th 408,438.)

Defendant argues we must apply the federal harmless-beyond-a-reasonable-doubt standard because he is asserting that his federal constitutional rights were violated. However, he concedes that California Supreme Court precedent establishes that the state standard applies to the harmless error analysis when the trial court fails to instruct on a lesser included offense. (*Breverman*, *supra*, 19 Cal.4th at p. 165.) We are therefore bound to apply the state standard: "[S]uch misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Ibid.*; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Here, given the opportunity to convict defendant of second degree murder and attempted murder without premeditation and deliberation, the jury selected first degree murder and attempted premeditated murder. In other words, it found that defendant did not act rashly but instead, in the words of the court's instruction, "carefully weighed the consideration for and against his choice and, knowing the consequences, decided to kill." (*See People v. Wharton* (1991) 53 Cal.3d 522, 572 [premeditation and deliberation inconsistent with heat of passion].)

There is some ambiguity in the jury's first degree murder verdict because the jury was given the option of rendering a first degree murder verdict based on either (1) premeditation and deliberation or (2) lying in wait. And the verdict did not reveal which the jury chose. The attempted murder verdict, however, is not similarly ambiguous. The jury expressly found that defendant acted willfully, deliberately, and with premeditation. Since the two crimes were committed by ambush virtually simultaneously, in a quick spray of bullets, there could be no argument that, while the jury found defendant acted with premeditation and deliberation with respect to the attempted murder, defendant did not similarly act with premeditation and deliberation with respect to the murder. Therefore, the verdict establishes that defendant did not act in a heat of passion when he gunned down Hernandez and Salazar during the Skyline incident.

Since there is no reasonable probability the failure to instruct the jury on voluntary manslaughter and attempted voluntary manslaughter affected the outcome of this case, any error in not giving those instructions was harmless.

ECF No. 12-1 at 29-33. Petitioner raised this claim again in a petition for review to the California Supreme Court (Lodg. Doc. No. 29), which summarily denied it (Lodg. Doc. No. 30).

        B.     <u>Relevant Federal Law</u>

Errors in instructing the jury can only support federal habeas relief if they "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. 62,

72 (1991). Allegedly erroneous instructions "must be considered in the context of the instructions as a whole and the trial record." *Id.* at 72. And a state court's reasoned interpretation that a petitioner was not entitled to an instruction under state law binds this court. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Lastly, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). That is, the error must have resulted in "actual prejudice." *Id.*

C.      Analysis

As an initial matter, respondent correctly notes that there is no clearly established Supreme Court precedent mandating jury instructions on lesser-included offenses in non-capital cases. By contrast, in *Beck v. Alabama*, the Supreme Court held that, in a capital case, a defendant's due process was violated "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. 625, 627 (1980). In his traverse, petitioner argues that the joinder of his claims "converted this matter into a capital case." ECF No. 13 at 34. He concedes, however, that after his motions to sever were denied, the prosecutor elected not to seek the death penalty. *Id.* at 34 n.9. Thus, the court concludes that the instant matter was not a capital case. *See*, *e.g.*, *Sand v. Superior Court*, 34 Cal.3d 567, 572 (1983) (concluding that a case in which the death penalty would not be sought was not a "capital case" for the purposes of Penal Code § 987.9). Confoundingly, petitioner argues that "even if this [c]ourt concludes that this was not a capital case, because the prosecution ultimately decided not to seek the death penalty, the holdings in *Beck* should be applied." ECF No. 13 at 34. He offers no cogent argument for such an application and, in any event, the Ninth Circuit has explicitly held that "[u]nder the law of this circuit, the failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question." *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998).

1    In what appears to be a kind of litigative afterthought, petitioner argues for the first time in

2    his traverse that his trial counsel should have requested the relevant instructions and, the failure to

3    do so, "fell below the standard of effective counsel."  ECF No. 13 at 36.  This newly raised

4    argument is not well taken and the court declines to reach it.  *See Cacoperdo v. Demosthenes*, 37

5    F.3d 504, 507 (9th Cir. 1994) (district court need not consider habeas claim raised for the first

6    time in traverse).

7                                              CONCLUSION

8            For all the reasons explained above, the state courts' denial of petitioner's claims was not

9    objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS

10   HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

11           These findings and recommendations are submitted to the United States District Judge

12   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

13   after being served with these findings and recommendations, any party may file written

14   objections with the court and serve a copy on all parties.  Such a document should be captioned

15   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16   shall be served and filed within fourteen days after service of the objections.  Failure to file

17   objections within the specified time may waive the right to appeal the District Court's order.

18   *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

19   1991).  In his objections petitioner may address whether a certificate of appealability should issue

20   in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section

21   2254 Cases (the district court must issue or deny a certificate of appealability when it enters a

22   final order adverse to the applicant).

23   DATED:  July 30, 2019.

24                                          EDMUND F. BRENNAN
25                                          UNITED STATES MAGISTRATE JUDGE

26

27

28

34